Filed 6/9/15  P. v. Thomas CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B256255 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA128810) |
| v. | |
| CLAUDE H. THOMAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Kelvin D. Filer, Judge.  Affirmed.

Marilyn Weiss Alper, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant Claude H. Thomas appeals from a judgment sentencing him to a term of 25 years in state prison after he pled no contest to a charge of attempted murder (Pen. Code, § 664/187, subd. (a))[1] and admitted violating section 12022.53, subdivision (c), pursuant to a negotiated disposition.

In his form notice of appeal, defendant checked a box indicating that the appeal arises from "A Plea of Guilty or Nolo Contendere, or an Admitted Probation Violation," and another box stating that "[t]his appeal is based on the sentence or other matters occurring after the plea." He did not check the box indicating that the appeal challenges the validity of the plea or admission; the form indicates that if that box is checked the notice of appeal must be accompanied by the attached request for certificate of probable cause. Although defendant signed the attached request for certificate of probable cause, he did not complete the form by stating why he believed the plea was illegal. In light of defendant's failure to check the box indicating that his appeal challenged the validity of the plea and his failure to indicate why he believed the plea was illegal, it appears that defendant did not request, and therefore did not obtain, a certificate of probable cause.

## BACKGROUND

We take our brief summary of the facts from the testimony at the preliminary hearing. The only witness who testified at the hearing was Los Angeles Police Officer Scott Wilhelm.

On the afternoon of January 21, 2013, Officer Wilhelm and his partner responded to assist Officers Loomis and Gastelum regarding a traffic stop of a possible shooting suspect. Earlier, Officers Loomis and Gastelum were in a parking lot at 108th Street and Spring Street when they reported hearing gunshots.

---

[1]    Further undesignated statutory references are to the Penal Code.

2

They drove in the direction of the gunshots, and began following a green minivan, broadcasting their location and direction of travel. The minivan drove north on Spring Street from 107th Street, turned west on 106th Street, then north on Olive Street to 104th Street, where it turned west, went under the 110 freeway, to Grand Avenue, and pulled into a driveway at 401 West 104th Street, where Officers Loomis and Gastelum conducted a traffic stop. Officer Wilhelm and his partner arrived at the location within a minute after the minivan parked. When they arrived, the two occupants of the minivan (one of whom he identified as defendant) were out of the vehicle and had been placed on the ground.

While Officer Wilhelm was at the scene, a radio call came in regarding a shooting investigation, and he and his partner responded to the reported location, at 220 West 107th Street. When they arrived at the location, they spoke with Jamal Harris. Harris told them that he was walking westbound on the south sidewalk of 107th Street when a green minivan approached him coming eastbound. The minivan slowed as it approached him, and the passenger reached out of the vehicle and said something (Harris could not discern exactly what was said). The passenger then reached out of the vehicle with a gun in his hand and fired approximately 10 shots at Harris. None of the shots hit him.

Officer Wilhelm brought Harris to the 104th Street location to conduct a field identification. As they approached the location, Harris immediately identified the green minivan as the minivan that was involved in the shooting. The suspects (who were being detained in police cars) were brought out one at a time. Harris identified defendant as the passenger who shot at him, and identified the other suspect as the driver.

After the field identification, Officer Wilhelm had a conversation with Jorge Castillo at his residence on 107th Street. Castillo told him that he had a video surveillance system that had captured the shooting. Officer Wilhelm and other

3

officers went into Castillo's house and watched the recording, which also had audio. The video showed Harris walking westbound on 107th Street, and a green minivan driving eastbound approaching Harris. The minivan slowed (it appeared to be going five to 10 miles per hour), and a black male individual in the passenger seat extended his body outside of the vehicle with his arm out, holding a black object consistent with a black semiautomatic handgun. At that point, Officer Wilhelm could hear multiple gunshots, and saw Harris dive to the ground away from the vehicle. Harris had his arms extended and his hands open; Officer Wilhelm did not see any objects in his hand.

After viewing the video, Officer Wilhelm had a conversation with Officer Loomis. Officer Loomis told him that he and his partner conducted a search along the path that the minivan had driven while Officer Loomis had been following it, and they found a weapon on 104th Street right next to the north sidewalk, underneath the 110 freeway. Officer Loomis told Officer Wilhelm that he and his partner had momentarily lost sight of the minivan two times when they were following it; one of those time was when the minivan went under the freeway overpass, where the weapon was found. No weapon was found inside the minivan.

Defendant was charged by amended information with attempted willful, deliberate, and premeditated murder (§ 664/187, subd. (a)), with allegations that he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) and personally used a firearm (§ 12022.53, subd. (b)), and assault with a firearm (§ 245, subd. (a)(2)), with personal use allegations (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)). The information also alleged that defendant had suffered a prior serious felony conviction qualifying as a strike under the Three Strikes law (§§ 667, subds. (b)-(j), 1170.12), and that he had served four prior prison terms (§ 667.5, subd. (b)).

4

On January 17, 2014, both sides announced ready for trial, and jury selection commenced. On January 21, 2014, during a break in voir dire, defendant's counsel noted there had been a change in circumstances, in that the victim, Harris, who had not been cooperative and had not been present for a long time, was currently in custody. She indicated that she had asked the prosecutor if the plea deal that had been offered to defendant was still open, because defendant indicated that he might accept it if the offer was for less than 20 years. The trial court agreed to take a recess to allow the prosecutor to check with her supervisor. After the recess, the prosecutor informed the court that she could offer defendant a sentence of 25 years, but that the offer would close once they continued to pick the jury. Defendant indicated he would accept that offer.

The prosecutor went through the charges and allegations on the record, indicating that defendant's maximum exposure was 43 years to life. Defendant indicated that he understood the charges, had discussed them with his attorney, and that he desired to plead guilty or no contest to one or both of the charges and allegations. The prosecutor told defendant that he would be pleading to attempted murder -- without allegations that it was willful, deliberate, and premeditated -- and would be admitting a violation of section 12022.53, subdivision (c), and that the remaining count and allegations would be dismissed; he would receive the low term of five years on the attempted murder and 20 years on the gun allegation, for a total of 25 years. Defendant stated that he understood.

The prosecutor then explained defendant's constitutional rights and asked defendant if he understood and gave up those rights. Defendant said that he did. After explaining the consequences of the plea and obtaining defendant's acknowledgment that he understood the consequences and was pleading freely and voluntarily, the following exchange occurred:

"[PROSECUTOR]: Has anyone made any threats or promises to you or anyone close to you in order to get you to plead today, Mr. Thomas?

"DEFENDANT THOMAS: Being railroaded.

"THE COURT: Has anyone made any threats to you to get you to plead today?

"DEFENDANT THOMAS: No.

"[DEFENDANT'S COUNSEL]: He said no.

"[PROSECUTOR]: Can I just get a clear no for the record?

"THE COURT: Mr. Thomas?

"DEFENDANT THOMAS: I said no."

The prosecutor then took the plea; defendant pled no contest to attempted murder and admitted the allegation that he personally discharged a firearm. The court accepted the plea.

At the scheduled sentencing hearing, defendant's counsel informed the court that defendant wanted to withdraw his plea. Defendant told the court that he was under stress at the time he accepted the plea, because his lawyer kept telling him that he was going to lose and he felt threatened. After hearing from defendant's attorney and the prosecutor, the court said, "All right. And the court remembers this case as well from when it was first sent to me, and even in my notes I have written here regarding the dispo that Mr. Thomas kept going back and forth. And I even allowed him to speak directly to his mother to see if the matter can be settled. [¶] There was absolutely no pressure put on him or on [his codefendant]. There were no threats made in this court's presence, and I'm not aware of any threats whatsoever that were made to him, and I would not have accepted the plea if I thought he had been threatened. [¶] And I think what my notes indicate, once the People indicated they located their victim, then Mr. Thomas and [his codefendant] decided to accept a now revised offer. [¶] So you were going back and forth. You

6

were not threatened. There's nothing that indicates that. In fact, after you talked to your mom, then you said you want the deal. . . . So there was no threats, no pressure. [¶] We took our time. I inquired several times, does Mr. Thomas have any questions about what the offer was. The People did as well in taking the waivers. And he indicated that he did not."

The court denied the motion to withdraw the plea, but granted defendant's request to continue the sentencing hearing so his father, who was ill, could be present. At the continued sentencing hearing, the court sentenced defendant to the low term of five years, plus a consecutive term of 20 years under section 12022.53, subdivision (c), for a total prison commitment of 25 years. Defendant timely filed a notice of appeal from the judgment.

## DISCUSSION

Because defendant did not receive a certificate of probable cause, his appeal is limited to claims of error occurring after entry of the plea that do not challenge the validity of the plea. (*People v. Mendez* (1999) 19 Cal.4th 1084, 1088 (*Mendez*); § 1237.5.) After review of the record, defendant's court-appointed counsel filed an opening brief asking this court to review the record independently under the holding of *People v. Wende* (1979) 25 Cal.3d 436, 441, and advised defendant of his opportunity to file a supplemental brief.

Defendant filed a letter brief with this court, in which he asserts that his trial counsel provided ineffective assistance and pressured him into accepting a plea deal. Because he did not obtain a certificate of probable cause, however, he cannot raise on appeal this pre-plea issue. (*Mendez*, *supra*, 19 Cal.4th at p. 1088.) That issue, if it is to be raised at all, must be raised by petition for writ of habeas corpus.

We have examined the entire record and are satisfied that no arguable issues exist, and that defendant has, by virtue of counsel's compliance with the *Wende*

7

procedure and our review of the record, received adequate and effective appellate review of the judgment entered against him in this case.  (*Smith v. Robbins* (2000) 528 U.S. 259, 278; *People v. Kelly* (2006) 40 Cal.4th 106, 112-113.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.